# FOR PUBLICATION

ATTORNEY FOR APPELLANTS:

**JONATHAN H. NUSBAUM**
Beers Mallers Backs & Salin, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**JAMES A. McENTARFER**
**WILLIAM B. BRYAN**
Angola, Indiana



FILED
Oct 27 2014, 10:04 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| DAVID T. HAYS and AMANDA G. HAYS, )<br><br>   Appellants-Defendants, )<br><br>        vs. )<br><br>DEBORAH J. WISE, )<br><br>   Appellee-Plaintiff. ) | No. 76A04-1401-PL-43 |

APPEAL FROM THE STEUBEN SUPERIOR COURT
The Honorable Allen N. Wheat, Special Judge
Cause No. 76D01-0902-PL-98

**October 27, 2014**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Homeowners David T. Hays and Amanda G. Hays (collectively "the Hayses") sold their home after completing Indiana's statutory disclosure forms. Purchaser Deborah J. Wise ("Wise") sued the Hayses, alleging that the Hayses failed to disclose defective conditions in the home. Following a bench trial that occurred on remand from this court, the Hayses now appeal the trial court's findings of fact, conclusions thereon, and judgment, which found in favor of Wise on her complaint and determined that the Hayses made misrepresentations in their responses to several question on the residential real estate sales disclosure form. The Hayses raise two issues that we restate as:

I.      Whether the findings, conclusions, and judgment are unsupported by the evidence and are clearly erroneous due to a lack of evidence that the Hayses had actual knowledge of the various defects as alleged by Wise; and

II.     Whether the judgment ordered damages in excess of the amount that would have been required to repair known structural defects and is therefore clearly erroneous.

We affirm.

**FACTS AND PROCEDURAL HISTORY**

This is our second meeting with the parties. This current appeal comes to us following a prior appeal by Wise, after her complaint alleging negligence and rescission of the real estate purchase due to fraud, misrepresentation, and failure to disclose was dismissed pursuant to the Hayses' Indiana Trial Rule 12(B)(6) motion to dismiss for failure

2

to state a claim.[1]  In their Rule 12(B)(6) motion, the Hayses had argued that Wise had no right to rely on their representations because Wise had a reasonable opportunity to inspect the property herself.  Upon review of that dismissal, we determined that the Hayses' motion was properly considered as one for summary judgment, and we reversed and remanded in a published opinion, finding that remand for trial was appropriate because genuine issues of material fact existed as to whether the Hayses made fraudulent misrepresentation on the sales disclosure form.[2]  *Wise v. Hays*, 943 N.E.2d 835, 843-44 (Ind. Ct. App. 2011).  We will borrow some of the facts outlined in our prior *Wise* opinion to provide relevant background/framework to our decision today:

> In 2007, Deborah J. Wise and her husband Travis were interested in purchasing a Wolcottville residence and surrounding real estate from David T. Hays and Amanda G. Hays.  The property consisted of around sixteen and a half acres.
>
> . . . .
>
> Wise and Travis decided to purchase the property and entered into a purchase agreement in March 2007.  The purchase agreement indicated that Wise and Travis reserved the right to have the property inspected and that they could terminate the agreement if the inspection revealed a major defect that the Hayses were unwilling or unable to remedy.
>
> . . . .

[1] A copy of neither the complaint nor the amended complaint is included in the record before us. However, we observe that according to the Chronological Case Summary, Wise sued not only the Hayses, but also other defendants, including DTH Construction LLC, Gold Key Home Inspection, Ness Bros. Real Estate & Auction, and Orizon Real Estate, Inc.  *Appellants' App*. at 4-5.  Wise subsequently filed a notice of dismissal without prejudice as to DTH.  *Id*. at 8.  In February 2010, the trial court granted the defendants' pending T.R. 12(B)(6) motions and entered orders of dismissal as to Gold Key, Ness Bros., Orizon, and the Hayses.  *Id*. at 9.  It appears that in her appeal from that decision, Wise contested only the dismissal of her claim against the Hayses, as there is no further mention of the other defendants – either in her prior appeal or in the current appeal that followed the trial on remand.  *See Wise v. Hays*, 943 N.E.2d 835 (Ind. Ct. App. 2011).

[2] Wise did not appeal the dismissal of her negligence claim.  *Wise*, 943 N.E.2d at 839.

The purchase agreement also indicated that Wise and Travis had received a Seller's Residential Real Estate Sales Disclosure Form. On the sales disclosure form, to the question, "Are there any structural problems with the building?" the Hayses marked the "No" box. (Question G6). To the question, "Have you received any notices by any governmental or quasi-governmental agencies affecting this property?" the Hayses marked the "No" box. (Question G7). To the question, "Have any substantial additions or alterations been made without a required building permit?" the Hayses marked the "No" box. (Question G9). To the question, "Is the property in a flood plain?" the Hayses marked the "No" box. (Question G14).

. . . .

Wise and Travis purchased the property following inspection of the residence by a licensed home inspector. The warranty deed transferring title to the property was recorded in April 2007.

. . . .

Sometime after the purchase, Wise began to have concerns about the residence and surrounding real estate.

. . . .

After the purchase, Wise also hired a professional engineer to inspect the residence. The subsequent report revealed numerous code violations and structural problems. For example, the professional engineer noted problems with the walls in the master bedroom:

> The drywall joint in the Northeast corner was noticeably cracked. [Travis] commented that on a windy night that you could feel the wall move. I pressed outward against the exterior wall near that wall junction and could definitely feel the wall move and see the drywall joint flex as I pushed against it with less than approximately 50 pounds force. The fact that I could do this means that the wall corners are not structurally tied together as required by code.

Other examples of problems with the residence included "a noticeable bounce to the [upstairs family room] floor" when walking across the room [] and a leak in the shower floor that "seems to have been there for a long period of time as evidenced by the black staining of the joists in the crawlspace area of the shower drain[.]"

4

*Wise*, 943 N.E.2d at 836-37 (internal citations omitted).

We reversed the trial court's dismissal order and remanded to the trial court. A two-day bench trial occurred in December 2013. After taking the matter under advisement, the trial court issued findings of fact, conclusions thereon, and judgment in favor of Wise and against the Hayses in the amount of $281,062.77, which included Wise's attorney fees. The Hayses now appeal. Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION

### I.  Real Estate Sales Disclosure Statutes

With respect to the sale of property, the general rule of law in this state used to be that "'the purchaser has no right to rely upon the representations of the vendor as to the quality of the property, where he has a reasonable opportunity of examining the property and judging for himself as to its qualities.'" *Johnson v. Wysocki*, 990 N.E.2d 456, 461 (Ind. 2013) (quoting *Cagney v. Cuson,* 77 Ind. 494, 497 (1881)). It reflected the common law doctrine of "buyer beware." However, the General Assembly's adoption of Indiana's residential real estate sales disclosure statutes, Indiana Code chapter 32-21-5, abrogated the common law principle of buyer beware for those types of residential real estate transactions to which the statutes apply. *Id*. at 466. "The General Assembly has simply relieved the buyer of needing to initiate a specific inquiry in order to get honest disclosure about significant features of a purchase[.]" *Id*. at 465. Now, a seller of residential real estate is required to complete, sign, and submit to the prospective buyer a real estate sales

5

disclosure form before an offer is accepted. Ind. Code § 32-21-5-10; *Boehringer v. Weber*, 2 N.E.3d 807, 812 (Ind. Ct. App. 2014), *trans. denied*.

The disclosure form requires the owner to disclose any known conditions of, among other things, the following:

(A) The foundation.
(B) The mechanical systems.
(C) The roof.
(D) The structure.
(E) The water and sewer systems.
(F) Additions that may require improvements to the sewage disposal system.

Ind. Code § 32-21-5-7. The statutory list of things that must be addressed in the disclosure form are "'the kind of defects that will most significantly affect the value and use of a home.'" *Johnson*, 990 N.E.2d at 465 (quoting *Dickerson v. Strand*, 904 N.E.2d 711, 717 (Ind. Ct. App. 2009) (Vaidik, J., dissenting)).

The sales disclosure form is not a warranty by the owner. Ind. Code § 32-21-5-9. However, "just because the statements made on the disclosure form are not warranties does not mean that they are not actionable representations[.]" *Johnson*, 990 N.E.2d at 462. Indeed, a seller may be liable for fraudulent misrepresentations made on the disclosure form when he or she had actual knowledge that the representation was false at the time he or she completed the form. *Id*. at 466.

## II.    Standard of Review

In this case, the trial court entered findings of fact and conclusions thereon sua sponte, determining that the Hayses were liable to Wise for failing to disclose conditions

6

about the house that were known to them.[3]  Where a trial court enters findings sua sponte, the specific findings of fact control only as to the issues they cover, while a general judgment standard applies to any issue upon which the trial court has made no findings. *Vanderwier v. Baker*, 937 N.E.2d 396, 398 (Ind. Ct. App. 2010).

> In reviewing the judgment, this court must determine whether the evidence supports the findings and whether the findings, in turn, support the conclusion and judgment.  We will reverse a judgment only when it is shown to be clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and conclusions entered on the findings.  In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made.  In determining the validity of the findings or judgment, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom, and we will not reweigh the evidence or assess the credibility of witnesses.

*Id*. (quoting *Borovilos Rest. Corp. II v. Lutheran Univ. Ass'n,* 920 N.E.2d 759, 763 (Ind. Ct. App. 2010), *trans. denied*).

The Hayses argue that (1) the trial court's findings of fact, conclusions thereon, and judgment are erroneous because there is no evidence that the Hayses had actual knowledge of any defects, and (2) the judgment is erroneous because the damage award exceeds the cost necessary to repair certain structural defects about which the trial court concluded that the Hayses knew.

### III.    Actual Knowledge

The issue for us to determine is not whether there were defects or deficiencies with the home's construction, structure, or foundation – the Hayses do not dispute the existence

---

[3] We commend the trial court on its detailed and thorough findings of fact and conclusions thereon, which greatly aided our appellate review.

of them – but rather whether the Hayses had actual knowledge of them. Our Supreme Court has held that pursuant to Indiana Code section 32-21-5-11, "[S]ellers can be held liable for errors, inaccuracies, or omissions on the Sales Disclosure Form if the seller has actual knowledge of the defect." *Hizer v. Holt*, 937 N.E.2d 1, 7 (Ind. Ct. App. 2010). Actual knowledge must be shown in order to show a failure to comply with the sales disclosure statutes, and a showing that an owner failed to disclose a defect of which he should have known is not sufficient. *Boehringer*, 2 N.E.3d at 812. That said, our Supreme Court has recognized that the element of actual knowledge can be inferred or "may be proven by circumstantial evidence notwithstanding the absence of a plaintiff's admission of such knowledge." *See Johnson*, 990 N.E.2d at 466 (recognizing that actual knowledge may be inferred, but declining to assess whether trial court could have inferred actual knowledge from facts before it and remanding for trial court determination; Justice Rucker dissenting, finding that facts of case sufficient from which seller's actual knowledge of defects could be inferred).

Here, the evidence revealed at trial was that this was a home that Mr. Hays personally built in 2000 with the assistance of four friends. Mr. Hays had never built a home or any other structure prior to this one, nor did he have any training or licensing or education in the area of homebuilding. He and Mrs. Hays originally purchased the undeveloped land in 1994, and they lived in a single-wide mobile home on the property. In December 1999, Mr. Hays submitted a preliminary building permit application to the LaGrange County Building Department ("LCBD"). In January 2000, the LaGrange County Surveyor inspected the real estate and observed that much of the sixteen-acre tract

8

was in a wetland flood hazard area and advised that a flood elevation certificate would be required. In February 2000, the Hayses submitted to the LCBD an application for building an improvement location permit ("the building permit"). The building permit issued by the LCBD was for a three-bedroom, two-bathroom residence. It stated that the Hayses needed to file a Certificate of Elevation and remove the manufactured mobile home before a Certificate of Occupancy would be issued. *Pl.'s Ex*. 3 at 192-93.

Before beginning construction, the mobile home was partially, but not entirely, removed from the property. Specifically, the Hayses chose to leave a section of its frame and use it in the crawl space of the new home to assist in the support of a section of the residence. After the house was framed and rafters were affixed, the Hayses decided to add two additional bedrooms and one additional bathroom to the upper floor, even though those three rooms were not part of the original construction plan. No additional plans or permits were sought or obtained by the Hayses from the LCBD for this additional construction, and the Hayses never obtained a Certificate of Elevation. In November 2000, the Hayses moved into the residence without ever having obtained from the LCBD a Certificate of Occupancy. During the years 2002 and 2003, the Hayses dredged areas of their property to address water issues. In June 2003, the Army Corps of Engineers contacted the Hayses by letter and advised them that the property was in violation of the Federal Clean Water Act due to sidecasting spoiled material from the stream onto wetlands; the Hayses thereafter remedied the dredging issue with the Army Corps of Engineers. The Hayses listed the home for sale in 2002; it remained on the market for a number of years, and they continued to live in it.

In early 2007, Wise expressed an interest in purchasing the Hayses' residence.[4] Before making an offer to purchase the home, the Wises hired an inspector who performed an inspection of the home in March 2007. The inspection report indicated that water had entered the crawl space in the past, and a distinct water line was visible, along with moist soil; however, the report did not note the presence of the mobile home frame and it did not reveal any problems with the framing or the foundation of the home. In April 2007, the Hayses executed a sales disclosure form and answered "No" to, among other questions, the following: "Are there any foundation problems with the improvements? Are there any structural problems with the building? Have you received any notices by any government or quasi-governmental agencies affecting this property? Are there moisture and/or water problems in the basement, crawl space area or any other area? Have any substantial additions or alterations been made without a required building permit? Are there any additions to the structure(s) that may require improvements to the sewage-disposal system? *Pl.'s Ex.* 2 at 190-91. With the help of a realtor, Wise and her then-husband purchased the home and moved into the residence in early April 2007.

Shortly after moving into the home, Wise and her then-husband investigated the possibility of extending a road on the property, and it was during this process that they discovered that the home's building permits were never completed, including that the Hayses never obtained a final inspection, and no certificate of occupancy was ever issued. In an effort to obtain a certificate of occupancy, Mr. Wise contacted LCBD and eventually

---

[4] Mr. Wise and Mrs. Wise each testified to having seen Mr. Hays's construction company sign indicating he possessed construction and excavating experience, and their realtor had told them likewise, so the Wises assumed Mr. Hays had homebuilding experience. *Tr.* at 133, 258, 260; *Pl.'s Ex.* 24 at 530.

spoke with the LaGrange County Building Commissioner, Mark Shaver, who performed an inspection. In a letter to Mr. Wise, dated October 28, 2008, Shaver made at least twenty-three observations about the home, including: no truss drawings were available; no intermediate bracing is installed; no gable end bracing is installed; homemade trusses have no documentation; improper splicing of stick built roof trusses; incorrect fasteners used; bedroom egress windows too small for 2 bedrooms; gas fireplace shutoff not accessible; too many outlets on upstairs electrical circuit; improperly mounted electrical boxes in crawl space and throughout; improper plumbing drain and gas line supports; unverifiable foundations; it appears the front footing may be on grade and not the required three-foot depth; attic framing shows no beam support and wrong fasteners; improper rafter splices; improper end support; homemade truss; a single wide trailer frame exists in the crawl space and appears to be used for support; the foundations under that frame were unable to be documented. *Pl.'s Ex.* 1B at 166-67.

Thereafter, at Shaver's suggestion, the Wises obtained an engineering inspection. They hired Paul Kimmerle, a civil and structural engineer, who inspected the premises for approximately eight hours and issued a report. As the trial court recognized in Finding 51, Kimmerle set forth the following list of construction deficiencies in his May 2009 written report:

a. Hallway floor joists not sufficient to carry weight;
b. Residence moving on its foundation;
c. Attic joists improperly connected with staples following splicing;
d. Manufactured tresses [sic] not properly braced;
e. Master bedroom wall would move when leaned against;
f. Exterior walls of garage sitting on concrete blocks without group and without anchor bolts[];

11

g.    All footers were not set at a depth of three (3) feet or more;
h.    Weight bearing capacity of crawl space floor joists insufficient;
i.    Anchor bolts were not spaced properly and some did not have a nut and washer attached; and,
j.    Bounce in upstairs floor caused by excessive length of floor joists.

*Appellants' App.* at 26-27.  The trial court's findings also recognized:  the construction deficiencies identified by Kimmerle existed on the date of closing (Finding 52), and Kimmerle characterized the home as being in a state of progressive collapse (Finding 53).

Our review of the record reveals that the evidence supports those findings.  Among other deficiencies, Kimmerle testified to the following observations:  a lack of window headers, which are horizontal beams used to support weight loads over windows; lack of anchor bolts in the foundation; the depth of the foundation was not to code because in places it was not to a depth of three feet, and in fact was less than six inches in one or more locations; the roof was missing studs; there was no bracing on certain 2x3 beams in trusses; interior walls would move when pressed upon because of a lack of intersecting studs to form strong corners; a mobile home trailer was left in the crawl space; certain 2x6 beams were stressed to 240% of their designated capacity and were "way overloaded"; a majority of anchor bolts around the perimeter did not have the required nut and washer to hold the foundation in place; a large tree stump was left in the crawl space, which provided food for termites, and it was located within one inch of wood floor framing; one particular 2x12 floor beam was carrying load from first and second floors, and the roof, and was stressed to 500% of its design capacity.  *Tr.* at 16-38.  In Kimmerle's opinion, the house in terms of code violations was "downright dangerous." *Id.* at 47.

The trial court also recognized, in Finding 54, that an expert testified that the entire structure would have to be gutted to repair all of the construction deficiencies set forth in the engineering report (Finding 54). Again, the evidence supports this finding. Kimmerle testified that, in his opinion, to repair the issues would require "jacking [up] the structure" and "gutting the house" because there were issues with foundation, framing, electrical, wiring, and plumbing. *Id*. at 49-50. The trailer frame underneath would need to be removed in pieces, necessitating use of a cutting torch, and the tree stump would need to be removed as well. Cletus P. Schinkle, Jr., an industrial design general contractor for over forty years, who also did residential work, inspected the home for the Wises. He was at the home for approximately an hour, and with regard to structural and foundational problems, he testified to the following defects: there was nothing anchoring the base plate of the garage walls to the foundation; some areas of the foundation were not deep enough; inadequate joists were used in framing; some interior walls lacked base plates; and the roof rafters were spaced unevenly. *Id*. at 67. He was concerned that with heavy snow loads or high winds, the house would shift and eventually cause a collapse. He testified that the myriad of problems would be "next to impossible to repair." *Id*.

We note that the trial court recognized in Finding 44 that Mr. Hays's explanation at trial for not obtaining a Final Inspection and Certificate of Occupancy for the residence that he and his wife later sold to Wise was that he "forgot" to do so. *Tr*. at 378; *Appellants' App*. at 25. According to the record before us, in June 2004, while the Hayses were still residing in the home at issue, Mr. Hays began construction of a second residence at another location; that home was completed in October 2007. For that second home – which the

13

Hayses later moved into – the Hayses obtained a Certificate of Occupancy in the fall of 2007, although they did not do so for the house that they sold to the Wises in April 2007. The trial court was not obligated to, and evidently did not, credit Mr. Hays's explanation that he forgot to obtain a final inspection and a Certificate of Occupancy, determining in Conclusion 12 that the Hayes had actual knowledge when they completed the disclosure statement that they had not complied with the LCBD code.

Based on the evidence it heard at trial, the trial court entered a number of other conclusions concerning the Hayses' actual knowledge of the home's defects, including but not limited to: Mr. Hays was a professional land excavator and was familiar with the construction of sewage-disposal systems (Conclusion 5); the Hayes had actual knowledge at the time that they completed the sales disclosure statement that the addition of two bedrooms and a bathroom may have necessitated an improvement to the existing sewage-disposal system (Conclusion 6); the building permit required the removal of the mobile home trailer frame, but it was not removed and was used as structural support, and Mr. Hays was aware that part of the foundation was only five to six inches deep rather than three feet (Conclusion 8); the Hayes had actual knowledge at the time that they completed the sales disclosure statement that there were problems associated with the foundation of the residence (Conclusion 9); the engineering report revealed numerous structural defects, and some were particularly obvious such as a bedroom wall that moved and a floor that bounced, and even though Mr. Hays was not a professional builder, the Hayes had actual knowledge of some structural defects when they signed the sales disclosure statement (Conclusions 14-16); the Hayses received correspondence in June 2003 from the Army

14

Corps of Engineers, and they had actual knowledge at the time that they completed the sales disclosure form that they had received written correspondence from a governmental or quasi-governmental agency about the real estate (Conclusions 18-19); the Hayses were aware of moisture problems in the crawl space before they completed the sales disclosure form (Conclusion 22); the Hayses added two bedrooms and a bathroom without having obtained a permit, and they had actual knowledge when they completed the sales disclosure statement that a substantial alteration or improvement had been made to the residence (Conclusion 25); and the Hayses had actual knowledge at the time that they completed the sales that a portion of the real estate was in a floodplain at the time they completed the sales disclosure form (Conclusion 30). *Appellants' App*. at 18-44. As outlined above, we find the evidence supported the findings, and the findings supported the trial court's conclusions.

The Hayses urge that we must reverse because Wise cannot identify one piece of direct or circumstantial evidence that establishes that the Hayses had actual knowledge, and, they claim, Wise cannot do so "because there was none." *Reply Br*. at 1. We disagree. Although there is no direct evidence that the Hayses had actual knowledge, *i.e*. they did not admit to possessing knowledge of the defects, we find that, based on the facts and circumstances of the case, there was sufficient circumstantial evidence before the trial court from which it could infer that the Hayses had actual knowledge. *See Vanderwier*, 937 N.E.2d at 397-98, 401 (affirming trial court's determination that sellers had actual knowledge of water infiltration into the home where, among other things, buyers' contractor testified that anyone who had lived in the house for longer than one year would

15

have seen some type of visible water). The Hayses' argument on appeal amounts to a request that we reweigh the evidence, which we will not do. The trial court, as the trier of fact, was empowered to weigh the evidence and credibility of witnesses in order to determine the facts, and to render judgment accordingly. Based upon our review of the record before us, we are not left with a firm conviction that a mistake was made.

The Hayses next argue that Mrs. Hays should not be liable because she had nothing to do with the construction of the residence, the application for permits, or the inspections. We are not persuaded that she has no liability. *Appellants' Br*. at 17. Mr. and Mrs. Hays owned the house, and they sold the house jointly. In so doing, they both executed the April 5, 2007 sales disclosure form and provided it to the Wises, who relied on it. The Hayses have not provided us with citation or support for their position, and to that extent we find that the issue regarding Mrs. Hays's liability or lack thereof due to her noninvolvement with the construction and permits is waived. Ind. Appellate Rule 46(A)(8).

## IV. Damages

The Hayses assert on appeal that the trial court's judgment must be reversed because the damages award was excessive. After entering 62 Findings and 42 Conclusions, which ultimately determined the Hayses failed to disclose known defects in the home to the Wises, the trial court turned to damages, determining: the fair market value of the land and the dwelling on the date of closing was represented to be $235,000, with $205,000 allocable to the residence and $30,000 allocable to the unimproved fourteen acres; there was no evidence in the record regarding specific repair costs associated with the construction defects other than they could total at least $400,000 and, thereby, exceed the

16

fair market value of the residence; there was no evidence regarding salvage value associated with the residence. *Appellants' App*. at 40-41. The trial court concluded that Wise suffered actual damages as a result of the Hayses' fraudulent conduct in the amount of $205,000 (fair market value of residence and unimproved real estate without fraud was $235,000, less fair market value of residence with fraud $0.00, less fair market value of unimproved land not affected by fraud $30,000 equals $205,000). *Id*. at 41.

On appeal, the Hayses reason that the damages award is excessive because in Conclusion 16 the trial court had stated that the Hayses had actual knowledge of "some structural deficiencies," yet the damage award was not limited to the amount that would be required to repair only "some" items; rather, the damage award was based on the cost to repair all of them. *Appellants' App*. at 33. Therefore, the Hayses claim, the trial court's damage award "runs afoul of I.C. 32-21-5-11," which limits a seller's liability to misrepresentations made with actual knowledge. We reject that claim.

First, contrary to the Hayses' suggestion on appeal that the trial court determined that the Hayses only had knowledge of a couple of structural defects, the findings and conclusions read as a whole reveal the trial court's determination that the Hayses had actual knowledge of multiple, if not all, of the home's defects or problems, beyond just "structural" ones – including foundational issues, moisture in the crawl space, flooding on the property, and a failure to comply with LCBD code or obtain a Final Inspection or Certificate of Occupancy – none of which they revealed in the sales disclosure form.

Second, the evidence presented at trial was that it would be effectively impossible to repair the defects. Schinkle visited the Wises' home at their request for purposes of

preparing an estimate of what it would cost to repair the home's deficiencies. At trial, Schinkle stated, "I determined it would be a waste of my time to prepare an estimate because there were so many deficiencies that were just next to impossible to repair." *Tr*. at 67. In response to further inquiry, Schinkle explained that, in order to repair the home, it would need to be lifted off its existing foundation to address the existing significant foundational problems, and that the only way to repair the second floor structural systems would be to tear off the second floor entirely and rebuild it. The cost of such re-construction would exceed the value of the home. Schinkle, a builder, estimated that the cost to demolish the home, remove the materials, and rebuild an identical home in accordance with current LaGrange County code would be between $410,000 and $450,000. *Id*. at 69.

Schinkle stated that, although he has built millions of square footage, he had "never seen [a building] quite this bad." *Id*. at 47, 68. Kimmerle likewise testified that he had "never seen a house with this many problems" and opined that the structure was in a state of "progressive collapse." *Id*. at 45. Given the facts and circumstances of the case, the Hayses have failed to persuade us that the trial court's judgment and award of damages was erroneous.

Affirmed.

BAKER, J., and ROBB, J., concur.